2014-74, Eastern Arkansas, Progressive Technologies v. Chaffin Holdings, et al. Mr. Ashley? Thank you, Your Honor. I'm Josh Ashley with Friday Elders and Clark, here for Appellants David Chaffin and Chaffin Holdings. The District Court barred David Chaffin from his chosen profession based on Progressive's likelihood of successfully enforcing a five-year post-employment non-compete, something that, as best we can tell, has never been upheld by any Arkansas appellate court and once runs counter to the statute... So you're characterizing it as post-employment, but isn't that really one of the key issues in this case, whether it relates to the sale of the business or the termination of employment? It is, Judge Kobus. We argue that it's unenforceable under either standard, but if it is seen as ancillary to employment and therefore using the employment standard, I don't think Progressive even argues that it's enforceable under that standard. Counsel, let me follow up on that, if I could. Obviously, it's a very key issue in this case, whether it's ancillary to the sale of a business or whether it's connected to employment. My question is whether the non-compete agreement restricts Chaffin from soliciting customers of Progressive that became customers after March of 2013. It does. Well, that depends in part, Your Honor, on when David Chaffin's employment ended, which is an issue we'll get to in a moment. My question was if it prohibits him from soliciting customers after the sale was completed, that would seem to indicate that restriction was not based on the sale. That is our argument, Your Honor. It does prohibit him from restricting customers that were not Arkansas State Security's customers at the time of the sale. Not only that, not only customers, but it also prohibits him from going into lines of business that were not pursued by Arkansas State Security at the time of the sale. It prohibits him from engaging not only in the types of business that were being done when he sold the business, but any type of business in any way competitive with anything Progressive does during any time Mr. Chaffin was employed by Progressive after the sale. And this is one of the issues, is Progressive doesn't have any Arkansas cases that say you should use the business sale standard in these circumstances. So they go to other states. Counsel, let me stop you with what troubles me about this case. We're reviewing a preliminary injunction and granted the resolution of numerous claims, only one of which is a covenant not to compete. Most of the rest are court claims of the unfair competition ilk. So even if the covenant not to compete does not support this preliminary injunction, that doesn't mean we reverse, does it? It does, Your Honor, because without the non-compete, there is no improper element to support the tortious interference claim. Now wait a minute, that hasn't been argued. Yes, Your Honor, we did argue that in our brief. Well, wait, let me back up. You say, well, he varied the covenant, therefore the injunction is absolutely wrong. He didn't follow that case that I'm forgetting the name of. But you're relying on the first paragraph of the judge's order, which from my contract drafting days would be more or less returned to a recital. The operative provision being the last paragraph of his lengthy order, which says the motion for preliminary injunction is granted. So I go see document number two. So I read document number two and not surprisingly, predictably, it ends in a wherefore clause. The wherefore clause has seven different components, number four of which is enjoins David Chafin from violating his non-compete with progressive. So that is the terms of the preliminary injunction. There is absolutely no departure from Arkansas law saying you can't rewrite a non-compete covenant under our state law. The court didn't. It ordered compliance. It granted an injunction based on that. And in the exercise of its equitable discretion in granting an injunction pendent lighted, which is no more coercive or harsh than it needs to be. He put in the 150-mile recital, which may or may not be operative vis-a-vis paragraph four of the wherefore. So I think your whole argument here is, unless I'm missing something, is misconstructed, so to speak. Yes, Your Honor. There are two responses to that. Number one is our understanding under Federal Civil Procedure 65 that an injunction needs to tell the person enjoined what they can and cannot do. It cannot just refer to another document. But more fundamentally. Wait, wait, wait. You didn't argue that. I know a lot about Rule 65. I've been practicing as a judge. And there was no Rule 65 issue presented. Your Honor, we agree with that. You're absolutely right. There's no argument that the wherefores in that motion that were adopted by reference does not satisfy the particularity requirements of Rule 65. Your Honor, in our brief, we took apart each particular enjoining provision and talked about why each of them varies. And we pointed out that the one that just refers to the non-compete is not valid as an injunctive language under Rule 65. But, Your Honor, this is— Wait, wait, wait. Because my proposition is that the other paragraphs of the wherefore must be reviewed in light of the tort claims. And the finding or observation of the district court that the preliminary injunction evidence shows that your client set out to destroy the defendant's business. Thank you, Your Honor. And that's what I want— If that's true, then the four corners of the non-compete do not have to be the outer limits of the preliminary injunction. Right? Yes, Your Honor. Thank you. And that's our argument, is that you cannot have—there is no tortious interference claim without a violation of the non-compete. And there is no civil conspiracy. I'm sorry, counsel. That's simply wrong. I mean, I've done enough. I've done enough business litigation. You can have an intentional interference that's tortious, intentional interference of a business or a contract that has no non-compete in it. But, Your Honor, the interference has to be improper. And there's no duty that would prevent David Chapman from doing what he did unless it's in the non-compete. And so without the non— If you are misusing trade secrets, that'll do it. But, Your Honor, the trade secrets claim formed no part of the district court's injunction. And Progressive is not pressing the trade secrets claim on appeal as any alternative basis for upholding anything. The misuse of confidential information. But, Your Honor, there was no confidential information without the non-compete because what David Chapman had— Without the non—what do you mean? Your Honor, what David Chapman had— You think tort law does not regulate an employee running behind the employer's back with confidential information of a competitor that the employee is about to join? Your Honor, the confidential— I won't have too much trouble finding cases supporting that claim. Yes, Your Honor. The information, though, is not confidential. It was just pricing information that was possessed by other Progressive employees who were under no agreement not to disclose that information. It was standard pricing information that Progressive displayed in open court without protection in the district court. So this is just standard information that's pricing information that, by the way, according to the district court, was not even used to compete. Because the district court said that Mr. Chapman was not even competing based on price. He said that the competitors left Progressive for essentially the same deal. So, Your Honor, without any improper interference, there's no tortious interference claim. And without a tortious interference claim, there's no tort for the civil conspiracy claim. So those claims are gone once the non-compete claim falls away. Now, getting back to the issue of whether this is ancillary to employment or not, Judge Ross, that was our point is that Progressive can't make the argument that it bargained for all this goodwill that did not even exist at the time it made its bargain. So even if you're going to use that test, which is not an Arkansas test, by the way, our argument is that you look at the language and structure of the non-compete. And here, the term doesn't run strictly from the sale of a business, as you would expect a business sale covenant to do. It also runs from the end of Chapman's employment. Why would a purely business sale covenant enjoin areas of competition far outside the selling business? But the other issue, though, is even if you're going to use this test that Progressive wants to use from other jurisdictions, none of those cases even support what they're asking to do. And in particular, we have evidence in the record about the bargaining power of the parties and what they bargained for. Brubaker, the president of Progressive, repeatedly testified that he bargained for, quote, a five-year quiet period. He said, quote, I mean, we negotiated hard on this whole acquisition. Everybody had counsel, and we understood we were buying a relationship-based business, and we understood that five years seemed an appropriate period. That's at Joint Appendix 259. He also said, quote, so the idea was that, you know, we would have this five-year window. And frankly, it seems pointless because he indicated he had no intention of working after this. And that's at Joint Appendix 423. So despite bargaining for a five-year quiet period and receiving six and a half years of quiet and $15 million in sales from David Chapman, Progressive now claims it's entitled to 11 and a half years of non-competition in areas beyond what it purchased. That is not supported by any case that Progressive has cited, and certainly no Arkansas case. We also argue that even if it's a business sale standard, even if that's the one to use, this is still hopelessly overbroad because it goes far beyond the areas pursued by the selling business. Briefly, because I'm getting close to my rebuttal, there's also the issue of whether the non-compete even applies in this case. It runs from five years after the end of David Chapman's employment. His employment, as we've argued in our brief, ended in one year. It ended in March 1 of 2014, one year after the sale, when the last vestige of employment status ended. Before that, David Chapman was essentially employee in name only. He got a minimal salary. He got a W-2, and that was about it. He didn't have an office at Progressive. He didn't sell in Progressive clothing. Counsel, does the record show what his ownership interest in the company that he instructed be paid is what had been a salary? Your Honor, I don't know. I'd have to go outside the record. I think in our jurisdictional statement, we talked about whether it was publicly traded, and it wasn't. I don't have any reason to believe he doesn't own the majority of it, candidly, but that's outside the record, Your Honor. Why does the word employment in the covenant necessarily have to be construed by dragging in the 21-factor employee versus independent contractor test that's applied in many other quite unrelated contexts? It seems to me employment may not necessarily exclude all sorts of relationships that would not technically be an employee for tax or other purposes. Yes, Your Honor. I'm not sure that Progressive has argued that employee doesn't mean what standard legal language of employee means, but I'll tell you another reason. In the asset purchase agreement, it has a provision about post-closing restrictions, and they contemplate that the buyer, in its sole discretion, will formulate this non-compete. And the parties talk about it running from the end of David Chapman's employment or, quote, any consulting contract with buyer. That's in our addendum. I'm sorry, that's in Progressive's addendum at page six. But the point is, the asset purchase agreement talks about any consulting contract also would trigger it. But then you get to the non-compete drafted by Progressive's counsel in Tennessee, and you look at what the non-compete does, and it says employment. So there was an intentional decision there to go from any consulting contract or employment and narrow that to really just mean employment when you get to the non-compete. Your Honor, I'm well into my rebuttal, and with the Court's willingness, I'd like to reserve my time. Sure. Ms. Welford? Thank you, Your Honor. My name is Jay Welford. I represent the Progressive Technologies, Inc. in a case that it brought against David Chapman, Chapman Holdings, Inc., Joseph Howard, Brandon Clements, and AJL Technologies, Inc. All of the defendants except for David Chapman and Chapman Holdings, Inc. had settled after the first day of our preliminary injunction hearing, leaving only Chapman and Chapman Holdings, Inc. currently in this case. Your Honor, I would like to go directly, Judge Loken, back to your question about the stolen or confidential information in this case. And there were three things that were at issue, all in the record. There's a Google Cloud drive that Mr. Clements, who was a defendant and who worked for AJL, so did Joey Howard, who was a defendant, so did Mr. Chapman. He testified he was working for AJL as an independent contractor. And in the record, AJL was identified as a competitor of Progressive, formed in January of 2020, right before this lawsuit was filed. So Mr. Clements uploaded Progressive documents to a Google shared cloud drive that was shared with principals of AJL as well as Mr. Howard. Counsel, let's suppose that that's all true. Would that be a basis for enjoining him from engaging in his occupation anywhere in the state of Arkansas? Yes, Your Honor, it would. And here's why. He also, there were two other documents, Your Honor, and then I'll tell you why that justifies that. He also, Mr. Clements gave a physical hard drive, not just uploading to a cloud drive, to Joey Howard, a former defendant in this case, who gave it to Mr. Chapman, and then stole one other document at Mr. Chapman's request. Mr. Chapman was paying Joey Howard and Mr. Clements $20,000 a year, unknown to Progressive until his testimony in this case, under the table because they were helpful to him. And indeed they were. They stole documents and gave it to Mr. Chapman after he was terminated. So these documents were used. In fact, an identical bid was submitted to the Malvern School District using these documents. And Joey Howard and the defendant, Mr. Clements, went to the Malvern School District and met with that superintendent. Counsel, again, that might be a basis for an injunction as to the Malvern School District, but that's not what the injunction did. Well, and Your Honor, and I apologize. I'll jump ahead. And I was getting your question was, why would that justify an injunction across the entire state of Arkansas? And Progressive, through Mr. Brubaker, testified, and this is in the Joint Appendix, Volume 2, that Progressive bought Arkansas State Security, which was operating in Arkansas. 70% of its business now that Progressive does in Arkansas is with Arkansas school districts across the state of Arkansas. Mr. Chapman then testified on both direct and cross examination that he did business with those Arkansas school districts within 150 mile radius of Little Rock, a radius of Little Rock. For all practical purposes, and the court can take judicial notice of geography and the location of the state of Little Rock being close to the center of Arkansas, that that covers most of the state of Arkansas. Counsel, I have looked at that, and you're right, it covers most of the state. It does, however, leave out the fastest growing city in Arkansas, Bentonville. Wouldn't that be overly broad? I don't think so, Your Honor. We noted and we attached what was in the record. All that we had in the record was a partial list of the locations of customers for Progressive in these school districts. And one includes Rogers, Arkansas, Your Honor. And if you're familiar with the Bentonville area, then I know Your Honor is familiar that Rogers is just right down the road from that. So we are operating in that area of the state, Your Honor, and an injunction would be appropriate, especially at, as Judge Miller noted in the preliminary injunction stage where we are dealing not only with the covenant not to compete issues, but we are dealing with serious civil conspiracy issues and tortuous interference with contract issues. If you look at the evidence of these school districts that Howard was able to, I'm sorry, that Mr. Chaffin, along with, in some cases, Mr. Howard, who were working with AJL, were able to get to in the couple of weeks before we were able to file suit. And the speed at which they would change over the contract or just cancel Progressive's contract is quite amazing. Counsel, would you address, would you address, Judge Colbis here, whether the tortious interference count survives if we find the non-compete to be invalid for whatever reason? Yes, here's, it obviously survives if you find it to be valid, Your Honor. If you found the non-compete not to be valid, you still have contracts that Progressive has with these school districts. You have a man, Mr. Chaffin and Mr. Howard, Mr. Chaffin, who's at issue here, who has knowledge of those contracts. He has intimate knowledge of those contracts. He's been servicing these contracts since he owned Arkansas State Security and been selling to these school superintendents. He is using, and the proof showed, going back to Judge Gratz's question about the stolen documents, the Google Cloud drive, the physical hard drive, this identical bids where the price don't change, but they want to change provider. He's using that stolen information that's been converted in connection with interfering with those contracts and taking those contracts, having them flat out breached and canceled by the school district. Counsel, wouldn't the injunction have to be limited to that alleged activity rather than prohibiting him from engaging in his occupation? I'm sorry, Your Honor. I missed the very first question. Wouldn't the injunction necessarily have to be limited to activity related to that allegation rather than that he couldn't engage in his occupation throughout the state of Arkansas? Your Honor, so he's been, what Mr. Chaffin and Mr. Brubaker's testimony was, that Mr. Chaffin has established these relationships across the state of Arkansas with school districts, with the superintendents of school districts, and this is a heavily, a very heavily relationship business. And both of them agreed. There was no dispute as to that. And we've cited cases in our brief on how that is a protectable interest. So if you're looking at injunctive relief and you've got Mr. Chaffin, who has serviced schools and has these relationships with the school superintendents, which has been described as, and I quote, a tight knit community is what Mr. Chaffin described them as. So you've got this tight knit community of school superintendents who want video surveillance, intercom, alarm systems, fire suppression systems, and they're giving time to people to listen to them and decide who they're going to go with on these bids. How do you not prohibit Mr. Chaffin from working across the state of Arkansas? That's basically where he has testified he has been working when he owned the business and after he sold the business. There was never a single time in the entire history of Arkansas state security and up through November 19th of 20 or 17th of 2019 that these superintendents did not associate those services with Mr. Chaffin. And Mr. Chaffin was paid for him on the front end and he was paid for them very handsomely when he was employed by Progressive. So there's never been a quiet period. There's never been a time that he didn't retain that Mr. Chaffin didn't retain some of that goodwill. I think this is somewhat in line with that point, but I'd like to ask you a question about Progressive's argument regarding the covenant not to compete and whether it's ancillary to the sale of business. Yes, sir. Your argument is that it should be measured from the termination of employment rather than the sale of the business. So how does that make it ancillary to the sale of the business? Your Honor, it is not uncommon for someone to sell a business and enter into an employment agreement in connection with that sale. There's not a test and none of these none of the cases cited say that the test is does the covenant run from the state of the sale of business or does the covenant run from the date of the termination of employment? And that goes back to my prior point on a quiet period. If you've got someone who's developed all this goodwill and it's an intangible and Progressive paid on the allocation of purchase price, which was Exhibit 4 in the preliminary injunction hearing and as part of Volume 1 of the record, $1.788 million for the goodwill, including the relationships. So if you've got that and you have someone who continues on servicing those relationships, then you have to have a box and bargain for protection. When you have an employment agreement, there is and you know, I hate to admit this because I argue these as well, but there's unequal bargaining power most of the time. Due to time, let me ask you another question here. You're simultaneously arguing that Mr. Chafin is wrong when he says that this would constitute an 11 and a half year restriction on his competition. How do you seems like you're trying to have it both ways? I don't think so, Your Honor, and here's why. When you're an employee, you cannot be engaged in competition with your employer. You've got to look at this as to what the party's barking for and as to the practical realities of this situation in not just Progressive buying Arkansas State Security. But counsel, they barked for a period of five years of quiet and didn't they get what they bargained for? They did not. As I was saying, Your Honor, there's never been a time that these school superintendents don't associate this business and the provision of this services with Mr. Chaffin. But during his time of employment, Progressive was directly benefiting from that, right? We bargained on the front end to get this protection. So as happens in many sales of business, you have the sale of the business, you have the allocation of the purchase price, and in this case, the majority of the purchase price was allocated to these relationships. Kutak Rock represented Mr. Chaffin. Another law firm represented Progressive. They were both represented by counsel. Both parties testified it was a hard bargained negotiation. But counsel, at the time that that sales price was negotiated, wasn't it based upon a five-year quiet period, not 11 and a half years? But it was based upon a five-year quiet period that terminated at the end of employment, Your Honor. There's no question of that. Mr. Ashley and I disagree vehemently on when Mr. Chaffin's employment ended, but there is no question that the five-year quiet period triggered at the end of his employment. That's what was bargained for. Now, Chaffin argues that it ended much earlier than it did. When you read these agreements, you have the asset purchase agreement, which says, and all of these agreements, this asset purchase agreement, it references the non-competition agreement. It references Mr. Chaffin's employment agreement. The deal documents, these are, to me, the three most important deal documents for the court to look at. These three deal documents reference each other. They were entered into, negotiated, and were entered into contemporaneously. Let me ask you a hypothetical. Let's suppose that instead of working for six years after the sale, Mr. Chaffin worked for 25 years after the sale. At what point, if any, does the non-compete start relating to the employment rather than the sale of the business? Your Honor, it does not matter how long Mr. Chaffin was employed by Progressive for that covenant to run. And so is there authority that the state of Arkansas would uphold a covenant not to compete that lasted for 26 years? There's one that they would uphold, Your Honor, and I'm looking for the site. But there are, in our brief we put out, there are covenants that the state of Arkansas has upheld for five years. They've upheld for 10 years. They've upheld for 15 years. And they've upheld for 25 years. And weren't those longer ones all about 100 years ago? Some of those were quite some time ago, Your Honor. Wright v. Marshall is the case I was trying to think of. In that case, ostensibly reading it several times does not look like it even had any time limit. And, Your Honor, when you think about it, even under the stricter standard of an employment context, and I think our covenant would be enforceable under that standard as well, but I don't think you even get close to getting there. But, sure, you would have an employee who's employed, hypothetically, if you had an employee employed for 20 years, wouldn't you even have more reason to have a restrictive covenant for a time period after they leave? They've had 20 years of developing customer relationships, in this case away from the office, so that it's a one-on-one or a one-on-two situation. And they know your company. They know, and you've paid them to, you've paid them to develop those relationships. And, Your Honor, I realize I'm out of time, but thank you. Thank you. Thank you, Your Honor. I want to briefly make a very limited number of points. First is, this is not confidential or protected information. I would direct the court to Lamb & Associates 2020 ARC App 62, which is cited at Joint Appendix 93. The Arkansas Court of Appeals held a year ago. This kind of information is not a protectable business interest. It's not confidential because other employees had access to it without restriction. Secondly, Ms. Wolford admitted that when you're employed, you cannot be in competition. These parties were not in competition. They had the quiet period. Progressive got a lot of money for it. I think that's covered in the briefs. The length versus area issue. There are some cases in the business sale context, not employment, that have a longer term. But look at the geographical restriction in those cases. It's usually a county. It's maybe 40 or 50 miles. In one case, it was just the block across the street from the gas station. Also, look at the breadth of the competitive behavior that's prohibited by those agreements. It's not this anything in any way competitive in any time during the employment, which is what we have here. The last thing is this theme that keeps coming up about Mr. Chaffin paying Mr. Howard and Mr. Clements. He did that out of kindness. It doesn't make sense that he would pay Mr. Howard years in advance so that in the future, when he discovered concerning behavior about Progressive and he wanted to investigate that, he would need Mr. Howard around at some point in the future he didn't know about. Your Honor, Progressive got what it bargained for. It wants to now part ways with Mr. Chaffin and also keep him out of competition. It can't have it both ways. We ask this court to reverse and vacate the district court's injunction. Thank you. Thank you, counsel. The case has been thoroughly and well briefed and argued, and we'll take it under advisement.